Jeffrey J. BODNAR and Jennifer
L. Bodnar, Plaintiffs,

v.

HI–LEX CORPORATION, Renken Boat
Manufacturing Company,
Defendants.

RENKEN BOAT MANUFACTURING
CO., Counter–Claimant,

v.

HI–LEX CORPORATION,
Counter–Defendant.

HI–LEX CORPORATION,
Third Party Plaintiff,

v.

TERPSTRA'S BLUE WATER MARINE,
INC., Third Party Defendant.

RENKEN BOAT MANUFACTURING
COMPANY, Third Party
Plaintiff,

v.

TERPSTRA SALES & SERVICES, INC.,
Individually and d/b/a Terpstra's Blue
Water Marine, Third Party Defendant.

Civil No.:   3:91–CV–565–TS.

United States District Court,
N.D. Indiana,
Lafayette Division.

Jan. 29, 1996.

Julie Fouts, East Chicago, IN, Vernon Petri, Indianapolis, IN, Boyd McDowell, III and Anthony Colantoni, Chicago, IL, for plaintiffs.

Donald Segal and Lori Isaacs, Chicago, IL, for defendant Hi–Lex.

David Patterson Gloor and Michael Gucco, Chicago, IL, for Renken.

Willis Tribler, Panos Topalis and Jean Franke, Chicago, IL and Alan Faulkner, Hammond, IN, for Terpstra.

### ORDER

SPRINGMANN, United States Magistrate Judge.

This matter is before the Court on the Third-party Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6). On July 9, 1990, Jeffrey and Jennifer Bodnar filed the present products liability action based on alleged defects in the design of the throttle control system of their pleasure boat. Originally, the Plaintiffs sued four defendants: Outboard Marine Corporation (manufacturer of the boat's motor), Det–Mar Corporation (who assembled and marketed the instrument panel assembly), Renken Boat Manufacturing Company (manufacturer of the hull and deck and assembler of the boat) and Hi–Lex Corporation (manufacturer of the throttle control system and allegedly the throttle cable). In the complaint, the Plaintiffs properly invoked this Court's jurisdiction under 28 U.S.C. § 1332.

The Court granted Summary Judgment in favor of Defendant Det–Mar, on June 27, 1991, and in favor of Defendant Outboard Marine Corporation on July 10, 1991. The remaining two Defendants, Renken Boat Manufacturing Company and Hi–Lex Corporation, filed third-party complaints against Terpstra's Blue Water Marine on July 5, 1991, and June 28, 1991, respectively. Terpstra's Blue Water filed its motion to dismiss on August 27, 1991. The motion is fully briefed.

### FACTUAL BACKGROUND

The facts, taken in a light most favorable to the Third-party Plaintiffs, are as follows: On July 8, 1988, Jeffrey and Jennifer Bodnar were motorboating off the Indiana shore of Lake Michigan. At the time of the accident, Jeffrey was in the water, having just fallen off his water skis. Jennifer Bodnar was driving the boat and proceeded to steer toward Jeffrey to pick him up. The boat came too close to Jeffrey, and its propellers struck and injured him.

The Bodnars filed suit against both Renken and Hi–Lex asserting claims for products liability (both strict liability and negligence) and a claim for loss of consortium against each of the Defendants. In their third-party complaint for contribution against Terpstra's, Renken and Hi–Lex assert that Terpstra's breached its duty to use reasonable care in the examination, service, sale, maintenance and repair of the Plaintiffs' pleasure boat. Specifically, they allege that on or about June 2, 1983, Terpstra's took in trade a Renken V–750 power boat from David Puent. After examining the boat and its component parts, Terpstra's resold the boat to Gerald

Koedyker. Terpstra's involvement did not end with the sale, however. They periodically winterized and examined the vessel to determine if there were any problems of major significance. Gerald Koedyker subsequently sold the boat to the Plaintiffs. Thereafter, on numerous occasions, Terpstra's performed winterization service, spring start-up service and general maintenance to the Plaintiffs' boat. The Third-party Plaintiffs, Renken and Hi–Lex, allege that the negligence of Terpstra's caused any damages which may be owed the Plaintiffs.

## THE MOTION TO DISMISS

Terpstra's responded to the Defendants' third-party complaints with its motion to dismiss. In its motion, Terpstra's argued that Indiana law applies to this case. Next, Terpstra's contended that Indiana law prohibits the Defendants' third-party complaints for contribution.

Both Renken and Hi–Lex responded to Terpstra's motion to dismiss by arguing that the present case falls under the admiralty jurisdiction of this Court. Therefore, admiralty law, and not state law, should govern the propriety of the Defendants' third-party complaint for contribution. Since admiralty law has long recognized claims for contribution, the Defendants argued, Terpstra's motion to dismiss should be denied.

## DISCUSSION

This case requires the Court to decide two issues. First, the Court must decide whether Indiana law or the law of admiralty applies to this case. Second, the Court must determine whether the prevailing law will allow third-party actions for contribution.

1. In diversity cases, federal courts must apply the choice of law principles of the state in which it is located. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Indiana applies the traditional lex loci delicti rule to tort claims. *Hardee's of Maumelle, Ark., Inc. v. Hardee's Food Systems, Inc.,* 31 F.3d 573 (7th Cir.1994); *Matter of Estate of Bruck,* 632 N.E.2d 745 (Ind.Ct.App.1994). Under that rule, the place of the last event necessary

## I.

The choice of law question presented by this case turns on the issue of admiralty jurisdiction. If the facts place the case within the Court's admiralty jurisdiction, substantive admiralty law will apply. If the case falls outside of the Court's admiralty jurisdiction, then the Court will maintain diversity jurisdiction alone. In cases based solely on diversity, the district court applies state substantive law. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). If this case only fell within the Court's diversity jurisdiction, Indiana law would apply.[1]

The interplay between jurisdiction and the substantive law is particularly important in this case. The Plaintiffs filed their original complaint based on the diversity jurisdiction of the federal courts. Both Renken and Hi–Lex filed their third-party complaints and based jurisdiction for those complaints upon the ancillary jurisdiction of this. Court. Terpstra's followed with its motion to dismiss and argued that Indiana law would not allow the case against Terpstra's to go forward. Renken and Hi–Lex responded and argued for the first time that admiralty law applied to the case. In its reply brief, Terpstra's argued that Renken and Hi–Lex, "having been caught in the switches," should not be allowed to invoke the substantive rules of admiralty law to this diversity case. (Third-party Defendant's Reply Brief in Support of Motion to Dismiss at 4).

■ Terpstra's argument is misplaced. The substantive rules of admiralty law will apply to a case if it falls within the Court's admiralty jurisdiction, regardless of whether or not the parties actually invoked that jurisdiction. *Carey v. Bahama Cruise Lines,* 864 F.2d 201, 206 (1st Cir.1988). In *Carey,* the court reviewed a district court's decision to apply Massachusetts law in a case which fit

to give rise to liability presumptively determines which state's law applies. The court will deviate from the lex loci rule only when the action has insignificant contacts with the place of the tort. In this case, the accident occurred just off the Indiana shore of Lake Michigan. Since Indiana does not have insignificant contact with the legal action, Indiana law will apply if the Court's jurisdiction is based solely upon diversity.

within the court's admiralty and diversity jurisdictions. The district court applied state substantive law to the case because the plaintiffs had failed to invoke admiralty jurisdiction under Fed.R.Civ.P. 9(h).[2] The district court believed that the plaintiffs were not entitled to have substantive admiralty law apply. The court refused to apply admiralty law because it had both diversity jurisdiction and admiralty jurisdiction over the case, and the plaintiffs had failed to identify the case as one arising in admiralty. *Carey,* 864 F.2d at 206. The First Circuit Court of Appeals overturned the district court's order. The court stated that

> Rule 9(h) is a purely procedural provision. Enacted after the merger of law and admiralty jurisdictions, it permits a plaintiff whose claim is cognizable under either jurisdiction to identify his claim as an admiralty claim to obtain certain procedural benefits traditionally available under admiralty jurisdiction.... Rule 9(h) does not authorize a plaintiff to choose the substantive law that applies to his claim.

*Id.* The court, finding that admiralty jurisdiction existed, applied substantive maritime law to the case.

Other cases agree with the court's decision. *See, e.g., Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550, 553 (1959) (If a case arises from conduct that brings it within the reach of the Court's admiralty jurisdiction, federal maritime law will govern the rights of the parties, even if an independent source of jurisdiction exists.); *Mink v. Genmar Industries, Inc.,* 29 F.3d 1543, 1547–48 (11th Cir.1994) (holding that once the court determines that it has admiralty jurisdiction, substantive admiralty law applies even if the court also has diversity jurisdiction); *Schumacher v. Cooper,* 850 F.Supp. 438, 447 (D.S.C.1994) ("Cases involving a tort committed on navigable water, whether brought under federal admiralty jurisdiction, in state court ..., or in federal court under diversity jurisdiction, are governed by admiralty law."); *In re Glacier Bay,* 746 F.Supp. 1379, 1383–84 (D.Alaska 1990) (holding that admiralty law applies to maritime torts regardless of whether the plaintiff invokes the procedural benefits of admiralty jurisdiction); *Neal v. McGinnis,* 716 F.Supp. 996, 998 (E.D.Ky.1989) ("Regardless of whether a maritime claim is brought on the admiralty or the law side of a federal district court, the parties' rights and liabilities are controlled by federal principles of maritime law.").

■ In the present case, the Plaintiffs made no Rule 9(h) designation.[3] Therefore, the Court will apply procedures as if it were sitting as a court of law. The Court will apply substantive admiralty law, however, if the facts place the case within the Court's admiralty jurisdiction. Failing to previously designate this case as a maritime claim will not defeat the application of substantive ad-

---

**2.** Admiralty rules of procedure differ substantially from those followed in diversity or federal question cases. In 1966, the Admiralty Rules were merged with the Federal Rules of Civil Procedure. The Advisory Committee recognized a need for parties to identify admiralty claims so that courts knew when to apply the special admiralty procedures. To meet this need, the Committee created Rule 9(h) which reads:

> **Admiralty and Maritime Claims.** A pleading or count setting forth a claim for relief within the admiralty and maritime jurisdiction that is also within the jurisdiction of the district court on some other ground may contain a statement identifying the claim as an admiralty or maritime claim for the purposes of Rules 14(c), 38(e), 82, and the Supplemental Rules for Certain Admiralty and Maritime Claims. If the claim is cognizable only in admiralty, it is an admiralty or maritime claim for those purposes whether so identified or not. The amendment of a pleading to add or withdraw an identifying statement is governed by the

principles of Rule 15. The reference in Title 28, U.S.C. § 1292(a)(3), to admiralty cases shall be construed to mean admiralty and maritime claims within the meaning of this subdivision (h).

Under the Rule, the plaintiff can identify the claim as an admiralty claim and enjoy the benefits (and detriments) of admiralty procedure. Rule 9(h), then, is most important when the case has more than one basis of federal jurisdiction. In those cases, the plaintiff can choose the procedures which the court will follow by identifying, or neglecting to identify, the claim as one arising in admiralty. *See* 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 21–1, at 465 (2d ed. 1994).

**3.** Professor Schoenbaum recommends making no reference to Rule 9(h) in the complaint when the pleader wishes to avoid admiralty procedures. *See* Schoenbaum, *supra,* § 21–1, at 467.

miralty law if the case falls within the Court's admiralty jurisdiction. If the Court has admiralty jurisdiction over the case, substantive admiralty law will apply. This Court, therefore, must decide whether this case falls within the Court's admiralty jurisdiction.

## ADMIRALTY JURISDICTION

The Supreme Court has enunciated a three-part test for determining when a case falls within the admiralty jurisdiction of the federal court. In *Jerome Grubart, Inc. v. Great Lakes Dredge and Dock Co.,* —— U.S. ——, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), the Court held that a court has admiralty jurisdiction over a tort claim if the claim "satisf[ies] conditions both of location and of connection with maritime activity." *Grubart,* —— U.S. at ——, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. The court then broke down the connection requirement into two subparts: the potential disruption of maritime commerce test and the substantial relation to maritime activity test. The Court will now apply these tests to the facts of this case.

## THE LOCALITY TEST

■ The locality test is easily satisfied in this case. Under that test, the tort must have occurred on navigable waters. *Grubart,* —— U.S. at ——, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035. In this case, the boat injured Jeffrey Bodnar on Lake Michigan. Without question, Lake Michigan is a navigable waterway. *See, e.g., Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (holding that jurisdiction existed when a fire erupted on a yacht docked at a marina on Lake Michigan). Furthermore, the locality test is met despite the fact that the allegedly defective manufacture and repair of the boat occurred on land. The tort is properly considered to have occurred on Lake Michigan because the alleged defect did not manifest itself, and the injury did not occur, until the Bodnars operated the vessel in the navigable waters of Lake Michigan. *See Mink,* 29 F.3d at 1546.

## THE CONNECTION TEST

■ In *Grubart,* the Supreme Court described the two requirements necessary to meet the connection test of admiralty jurisdiction.

A court, first, must "assess the general features of the type of incident involved" to determine whether the incident has a "potentially disruptive impact on maritime commerce." Second, a court must determine whether "the general character" of the "activity giving rise to the incident" shows a "substantial relationship to traditional maritime activity."

*Grubart,* —— U.S. at ——, 115 S.Ct. at 1048, 130 L.Ed.2d at 1035 (citations omitted).

### The Potential to Disrupt Maritime Commerce

■ The first step in deciding whether the incident has a potentially disruptive impact on maritime commerce is to define the incident. In *Grubart,* the court stated that the incident should be described "at an intermediate level of possible generality." *Id.* at ——, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038. In order to explain what it meant by "intermediate level of possible generality," the Court turned to its prior decision, *Sisson v. Ruby.* In *Sisson,* the Court held that admiralty jurisdiction existed over tort claims arising from a fire aboard a pleasure boat docked at a marina. The fire burned the boat, the marina, and other boats docked nearby. *Grubart,* —— U.S. at ——, 115 S.Ct. at 1048, 130 L.Ed.2d at 1037–38 (explaining *Sisson,* 497 U.S. at 367, 110 S.Ct. at 2898, 111 L.Ed.2d at 302.). In *Grubart,* the Court cited its own description of the incident involved in *Sisson* as an example of a proper description at an intermediate level of possible generality. The Court stated:

In *Sisson,* we described the features of the incident in general terms as "a fire on a vessel docked at a marina on navigable waters." ... To speak of the incident as "fire" would have been too general to differentiate cases; at the other extreme, to have described the fire as damaging nothing but pleasure boats and their tie up facilities would have ignored, among other things, the capacity of pleasure boats to

endanger commercial shipping that happened to be nearby. We rejected both extremes and instead asked whether the incident could be seen within a class of incidents that posed more than a fanciful risk to commercial shipping.

*Grubart,* —— U.S. at ——, 115 S.Ct. at 1050–51, 130 L.Ed.2d at 1037–38 (citing *Sisson,* 497 U.S. at 363, 110 S.Ct. at 2896, 111 L.Ed.2d at 300.). Taking the Court's statement as a guide, the "general features" of the incident in this case may be described as a collision between a water skier and a pleasure boat on navigable waters.

The next step in the analysis is to determine whether or not the incident, so described, has a "potentially disruptive impact on maritime commerce." In *Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), the Supreme Court found that a collision between two pleasure boats on navigable waters had a potentially disruptive impact on maritime commerce. *Id.* at 675, 102 S.Ct. at 2658, 73 L.Ed.2d at 306. This potentially disruptive impact, coupled with the traditional concerns of maritime law with navigation rules, provided the basis for the Court to exercise admiralty jurisdiction over the case. In *Sisson,* the Court held that a fire aboard a yacht docked in a marina could potentially disrupt maritime commerce. The potential impact existed despite the fact that none of the yachts or the marina at which they were docked engaged in maritime commerce. *Sisson,* 497 U.S. at 363, 110 S.Ct. at 2896, 111 L.Ed.2d at 300. A collision between a pleasure boat and a water skier in the water has the same potential to disrupt maritime commerce as does a collision between two pleasure boats or a fire aboard a yacht at a marina. Such an accident might require heroic rescue attempts and other emergency measures that could severely restrain commercial traffic through the area. A collision between a pleasure boat and a person in the water poses "more than a fanciful risk" of disruption to commercial shipping. Therefore, this case satisfies the potential disruption of maritime commerce prong of the connection test.

### Substantial Relationship to Maritime Activity

■ The second prong of the connection test requires that the general character of the activity giving rise to the incident show a substantial relationship to traditional maritime activity. *Grubart,* —— U.S. at ——, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038. Under this test, the Court asks whether "a tortfeasors' activity ... is so closely related to activity traditionally subject to admiralty law, that the reasons for applying special admiralty rules would apply in the case at hand." *Id.* at ——, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038. In the present case, three possible tortfeasors are identified in the complaint, the counterclaim and the third-party claim. In their complaint, the Plaintiffs assert that Renken Boat Manufacturing Company and Hi–Lex Corporation are the responsible tortfeasors for the accident. They assert that the defective nature of the boat or the throttle control system or both were responsible for the injuries to Jeffrey Bodnar. Renken and Hi–Lex each counterclaimed the Plaintiff, Jennifer Bodnar, the driver of the boat. The counterclaims assert that Jennifer Bodnar caused the injuries to Jeffrey Bodnar because of her negligent operation of the boat. Finally, the Defendants' third-party claim against Terpstra's Blue Water Marine contends that Terpstra's negligently repaired the boat and the throttle cable, thereby causing Jeffrey's injuries.

■ Only the activity of one of the three possible tortfeasors needs to have a substantial relation to traditional maritime activity in order to support admiralty jurisdiction. *Grubart,* —— U.S. at ——, 115 S.Ct. at 1052, 130 L.Ed.2d at 1039. If any of the three possible tortfeasors' activities meets the substantial relationship test, this case falls within the court's admiralty jurisdiction. In this case, though, all three alleged tortfeasor's activities have a substantial relation to traditional maritime activity.

*Jennifer Bodnar's Operation of the Boat—Navigation.* The Defendants allege that the activity giving rise to the incident was Jennifer Bodnar's negligent navigation of the boat. "[T]he negligent operation of a vessel on navigable waters ... has a sufficient nexus

to traditional maritime activity to sustain admiralty jurisdiction." *Foremost,* 457 U.S. at 674, 102 S.Ct. at 2658, 73 L.Ed.2d at 306 (1982). *See also Grubart,* — U.S. at —, 115 S.Ct. at 1052, 130 L.Ed.2d at 1039–40. *Foremost* involved a collision between two pleasure boats on navigable waters; however, other courts have held that the principles announced in *Foremost* apply to situations involving a collision between a pleasure boat and a swimmer or water skier in the water. *See, e.g., Hogan v. Overman,* 767 F.2d 1093, 1093–94 (4th Cir.1985) (holding that an action by an injured water skier against the operator of the tow boat alleging bore a substantial relationship to traditional maritime activity); *Oliver v. Hardesty,* 745 F.2d 317, 320 (4th Cir.1984) (A swimmer who was struck by a pleasure boat on navigable waters stated a claim within the admiralty jurisdiction of the federal courts since the alleged negligent operation of the defendant's vessel bore a significant relationship to traditional maritime activities.); *Medina v. Perez,* 733 F.2d 170, 171 (1st Cir.1984) (two swimmers struck and injured by a small outboard powered pleasure boat); *Schumacher v. Cooper,* 850 F.Supp. 438, 447 (D.S.C.1994) (collision between a small pontoon boat and a swimmer). *See also, Neely v. Club Med Management Services, Inc.,* 63 F.3d 166, 179–80 (3rd Cir. 1995) (scuba instructor sucked into the propellers of the scuba diving vessel); *Mink v. Genmar Industries, Inc.,* 29 F.3d 1543, 1545–47 (11th Cir.1994) (passenger aboard a pleasure craft who was slammed into the deck of the craft while it operated at a high rate of speed). In this case, the Defendants allege that Jennifer Bodnar caused the Jeffrey's injuries by negligently navigating the boat. Therefore, under *Foremost, Grubart* and the cited authority from the various circuits, this Court finds that one of the "activit[ies] giving rise to the incident shows a substantial relationship to traditional maritime activity." *Grubart,* — U.S. at —, 115 S.Ct. at 1051, 130 L.Ed.2d at 1038.

*The Defective Design of Renken and Hi-Lex—Products Liability.* In their complaint, the Plaintiffs assert that Hi–Lex manufactured, marketed and sold the gear shift of the boat and that the design of the gear shift was unreasonably dangerous and defec-

tive. Further, the Plaintiffs assert that Renken Boat Manufacturing Company designed, manufactured, marketed, assembled and sold the boat, and that the boat was designed, manufactured, marketed, assembled and sold in an unreasonably dangerous and defective state. The Plaintiffs assert that the defective nature of the boat and the gear shift caused the accident. In other words, the alleged tortious activity in the Plaintiffs' Complaint is the defective design of the boat and the gear shift.

The design and manufacture of the boat and the gear shift is an activity which is substantially related to traditional maritime activity. In *Anderson v. Whittaker Corp.,* 692 F.Supp. 764 (W.D.1988), *aff'd in part and rev'd in part on other grounds,* 894 F.2d 804 (6th Cir.1990), the plaintiffs brought a products liability action against the manufacturer of their capsized pleasure boat. The court held that the manufacture and design of a boat bore a substantial relationship to traditional maritime activity. In so holding, the court was

> impressed with the fact that this case involves the manufacture and design of a boat, a product that is inherently maritime in character. The design defects complained of bear directly upon the boat's ability to function as a boat, and to withstand operations on water. The suit was brought on behalf of the boat's operators, who had a right to rely on the boat's integrity under foreseeable marine conditions. The risks posed by the defect were that of swamping, sinking, and loss of crew and passengers on the water; these risks are exclusive to a maritime locale.

*Id.* at 768. This case also involves the manufacture and design of a pleasure boat, "a product that is inherently maritime in character." The Plaintiffs complain of design defects that bear directly upon the boat's ability to function as a boat. Like *Anderson,* the risks posed by the alleged defect were exclusive to a maritime locale. Under the facts of this case, the activity of designing, manufacturing and assembling a vessel or its parts has a substantial relationship to traditional maritime activity.

As a point of clarification, however, the activity of designing and manufacturing a boat does not, by itself, confer admiralty jurisdiction over this case. In *Harville v. Johns–Manville Products Corp.*, 731 F.2d 775, 783–85 (11th Cir.1984), for example, the court held that it did not have admiralty jurisdiction over an asbestos exposure case brought by land-based ship repair workers. Significantly, the court found that the plaintiffs had alleged injuries of a non-maritime nature which were caused by products not designed exclusively for maritime use. *Id.* In this case, by contrast, the allegedly defective products were all designed exclusively for maritime use. Furthermore, the defect and the risk of injury manifested itself in a maritime location and while being operated as a vessel in navigation. *See, Mink,* 29 F.3d at 1546 and *Anderson,* 692 F.Supp. at 768.

Several other courts have found admiralty jurisdiction over products liability actions involving pleasure boats. In all of these cases the alleged defects manifested themselves on navigable waters and bore directly upon the boat's ability to function as a boat. *See, Mink,* 29 F.3d 1543 (inadequate handholds or seats for passengers caused a passenger to lose his balance on a speed boat traveling at high speeds); *Hassinger v. Tideland Electric Membership Corp.,* 781 F.2d 1022 (4th Cir.) (defective mast), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986); *Sperry Rand Corp. v. Radio Corp.,* 618 F.2d 319 (5th Cir.1980) (defective steering gyro); *Jones v. Bender Welding and Machine Works,* 581 F.2d 1331 (9th Cir.1978) (defective design caused damage to fishing vessel); *Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.,* 519 F.2d 171 (5th Cir. 1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976) (negligent design of shrimp boat); *Richards v. Blake Builders Supply, Inc.,* 528 F.2d 745 (4th Cir.1975) (explosion on pleasure craft); *Anderson v. Whittaker Corp.,* 692 F.Supp. 764 (W.D.Mich. 1988) (products liability suit where pleasure craft sank), *aff'd in part and rev'd in part on other grounds,* 894 F.2d 804 (6th Cir.1990).

*Terpstra's Maintenance of the Boat—Negligent Repair.* In their third-party complaint against Terpstra's Blue Water Marine, Renken Boat Manufacturing Company and Hi–Lex Corporation assert that Terpstra's performed winterization service, spring start-up service and general maintenance and service over the course of several years to the boat in this case. The Defendants further allege that Terpstra's performed these maintenance and repair services negligently. According to the Defendants, Terpstra's negligence caused the accident to occur.

Admiralty law has long concerned itself with the repair and maintenance of vessels. *See generally* Schoenbaum, *supra,* § 5–7. Furthermore, the repair and maintenance of vessels is "a common, if not indispensable, maritime activity." *See Sisson,* 497 U.S. at 367, 110 S.Ct. at 2898, 111 L.Ed.2d at 302 and *White v. United States,* 53 F.3d 43, 48 (4th Cir.1995). Similar to the reasoning in the last section, the negligent repair of vessels is substantially related to traditional maritime activity, at least when the alleged negligent repair affects the boat's ability to function upon on navigable waters. The alleged negligent repair and maintenance of a vessel, when the effects of the alleged negligent repair manifest themselves on navigable waters, bears a connection to traditional maritime activity sufficient to sustain admiralty jurisdiction.

**II.**

Having found that substantive admiralty law will apply to determine the rights and liabilities of the parties in this case, the Court must now decide whether admiralty law will allow a right of contribution among tortfeasors. Unquestionably, admiralty law recognizes such a right. *Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); *United States v. Reliable Transfer Co.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Parker v. Gulf City Fisheries,* 803 F.2d 828 (5th Cir.1986). *See also* Marie R. Yeates, Phillip B. Dye and Roland Garcia, *Contribution and Indemnity in Maritime Litigation,* 30 S.Tex. L.Rev. 215 (1985).

**CONCLUSION**

For the foregoing reasons, the Third-party Defendant's Motion to Dismiss is DENIED.

ORDERED this 29th day of January, 1996.